# In the United States Court of Federal Claims

**No. 17-847C**
**Filed: September 5, 2017**
**Reissued: November 7, 2017[1]**

* * * * * * * * * * * * * * * * * *
THE STATE OF TEXAS, by and through
The Texas Workforce Commission,
Business Enterprises of Texas; and
ROLAND MARSHALL, a licensed blind
vendor,

          **Protestors,**

v.

UNITED STATES,

          **Defendant.**

* * * * * * * * * * * * * * * * * *

**Pre-Award Bid Protest; Ripeness Doctrine; Randolph-Sheppard Act, 20 U.S.C. § 107 et seq.; 34 C.F.R. § 395.33; Motion to Dismiss.**

**Peter A. Nolan**, Winstead, PC, Austin, TX, for protestor the State of Texas, by and through the Texas Workforce Commission, Business Enterprises of Texas.

**John C. Dulske**, Dykema Cox & Smith, San Antonio, TX, for protestor Roland Marshall.

**Daniel S. Herzfeld**, Trial Attorney, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C.

**O P I N I O N**

**HORN, J.**

Protestors, the State of Texas, by and through the Texas Workforce Commission, Business Enterprises of Texas (the State of Texas), and Roland Marshall, a blind vendor,

---

[1] This opinion was issued under seal on September 5, 2017. The parties were given the opportunity to propose possible redactions, and the protestors proposed redactions to the opinion.  The court agrees with defendant's position that no redactions are necessary or required. The original opinion is hereby unsealed and reissued without redaction.

bring this pre-award bid protest. The bid protest challenges the United States Department of the Air Force's implementation of corrective action following a post-award bid protest previously filed on the same solicitation by the State of Texas and Mr. Marshall. See State of Texas et al. v. United States, Case No. 17-266C (Fed. Cl. Feb. 24, 2017) (judgment entered March 8, 2017). In the earlier bid protest, the State of Texas and Mr. Marshall challenged the Air Force's award of a contract for full food services to Food Service of Gainesville, Inc. (FSIG),[2] after the State of Texas was excluded from the competitive range. While the earlier bid protest was pending, the Air Force decided to take corrective action, which included placing the State of Texas in the competitive range, and the undersigned issued an order enjoining the Air Force from proceeding with the contract award to FSIG at that time. See State of Texas et al. v. United States, Case No. 17-266C (permanent injunction issued on March 7, 2017). In the current bid protest, the State of Texas and Mr. Marshall argue that once the Air Force included the State of Texas in the competitive range, the Air Force was required to award the contract for full food services to the State of Texas pursuant to the Randolph-Sheppard Act, 20 U.S.C. § 107 (2012), and should be enjoined from further evaluating the proposals and awarding the contract "to any offeror other than the State of Texas."

## FINDINGS OF FACT

The history of this bid protest is that, originally, the Air Force issued a solicitation for "all personnel, supervision, equipment, and any items and services necessary to perform non-personal, full Food Services at JBSA [Joint Base San Antonio] FSH [Fort Sam Houston] and Camp Bullis," otherwise referred to in the solicitation as the "Fort Sam Houston Dining Facilities."[3] The solicitation explains that the contractor tasks would include the following:

---

[2] FSIG was granted status as a defendant-intervenor in the earlier bid protest and participated in the proceedings. In the current bid protest, FSIG was granted status as an amicus curiae, but, on July 11, 2017, in an e-mail to the court, opted not to submit any briefings in the proceeding and stated: "FSIG believes the Plaintiffs and Defendant are in the best position to address these preliminary issues."

[3] It is well established that, on a motion to dismiss, a court may consider material incorporated by reference in the pleadings. In addition to the complaint, the court also may consider exhibits to the complaint. See Rule 10(c) of the Rules of the United States Court of Federal Claims (RCFC) (2017) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). Moreover, "the court 'must . . . consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice.'" Bell/Heery v. United States, 106 Fed. Cl. 300, 307 (2012), aff'd, 739 F.3d 1324 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)) (omission in Bell/Heery v. United States); see also Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (explaining that the United States Court of Federal Claims was permitted to rely on a document incorporated into the complaint pursuant to RCFC 10). The court also may consider a document when the complaint relies heavily upon its terms and effect, which render the document integral to the complaint. See

dining facility management; accounting; cooking; food requisition and preparation; serving and replenishing food; cleaning facilities; property and utensils; maintenance of food service; preparing vegetables and fruits for the salad bar; cleaning tables in dining areas, where required; performing cashier services; handling foods, supplies, and property; maintaining quality control; ensuring operator maintenance and repair of food service property; removal and installation of food service equipment; pick up and deliver Operational Rations and in the event of contingency, perform all required tasks to include continued service.

The solicitation states that the procurement is a small business set-aside and that the Air Force contemplates the award of a firm fixed-price requirements contract. Offerors were instructed to submit their proposals in three volumes, including a technical proposal, a price proposal, and a past and present performance information volume.

The solicitation at issue in the bid protest currently before the court sets forth the Air Force's intention to conduct the procurement "pursuant to the Randolph-Sheppard Act (RSA), 20 U.S.C. § 107, et. [sic] seq., - Operation of Vending Facilities and 34 CFR § 395.33 [(2014)] – Operation of Cafeterias by Blind," which "establish priority for blind persons recognized and represented by the State Licensing Agency (SLA), in the award of contracts for the operation of cafeterias on federal facilities." The solicitation explains that "although the solicitation is set aside 100% for small business, the Texas State Licensing Agency will also be permitted to submit a proposal in accordance with 34 CFR § 395.33(b). Evaluation criteria are the same for all competing offerors, including the responsible SLA."

The solicitation explains how the proposals will be evaluated by the Air Force. According to the terms of the solicitation, the Air Force will evaluate proposals and award a contract "to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered." The proposals will be evaluated based on the following factors: technical acceptability, price, and past performance. The solicitation states that the Air Force will evaluate all proposals against all factors and assign a technical rating, a performance confidence rating, and a total evaluated price. The Air Force will evaluate the technical acceptability of all proposals and determine whether the proposals are technically "Acceptable" or

---

Bell/Heery v. United States, 106 Fed. Cl. at 307-08. Moreover, "[i]n deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record." Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999), cert. denied, 529 U.S. 1065 (2000); see also Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251 261–62 (2013); DeKalb Cnty., Ga. v. United States, 108 Fed. Cl. 681, 692 (2013). Accordingly, in this bid protest decision, the court considers documents incorporated into the complaint, including the solicitation.

"Unacceptable." The solicitation requires that an offeror must be determined "Technically Acceptable" to be eligible for contract award. Regarding price, the Air Force will evaluate prices for fairness and reasonableness. For past performance, the Air Force will determine a "Performance Confidence Assessment" using past performance information provided by the offerors. The solicitation explains that the offerors' past performance will receive one of the following ratings: "Substantial Confidence," "Satisfactory Confidence," "Limited Confidence," "No Confidence," or "Unknown Confidence (Neutral)."

Based on the assigned ratings and total evaluated prices, the Air Force will "establish the competitive range comprised of the most highly rated proposals at a fair and reasonable price." According to the solicitation, offerors are to be notified if they are excluded from the competitive range. After establishing the competitive range, if the Air Force determines that discussions are required, the Air Force "will hold discussions with all offerors in the competitive range and Final Proposal Revisions will be requested." Once the Air Force conducts discussions and receives "Final Proposal Revisions," "a best value determination will be accomplished in accordance with the source selection criteria." According to the solicitation, the Air Force may conduct "[t]rade-off considerations" and "consider award to other than the lowest priced offeror." The solicitation explains that, "[i]f the technically acceptable offeror with the lowest evaluated reasonable price has an overall Satisfactory Confidence performance rating, that offer represents the best value for the Government and the best value evaluation process stops at this point," "that offeror will receive award," "unless preempted by application of the SLA priority" under the Randolph-Sheppard Act. If, however, the technically acceptable offeror with the lowest evaluated reasonable price does not have an overall Satisfactory Confidence performance rating, then the technically acceptable offer with the next lowest evaluated price will be considered "and the process will continue (in order by total evaluated price) until the Government reaches a Technically Acceptable reasonably priced offer with a Satisfactory Confidence performance confidence assessment rating or until all Technically Acceptable reasonably priced offers remaining in the competitive range are considered, whichever occurs first." According to the solicitation, "[a]t this point," the Air Force will conduct "an integrated best value assessment of all offerors remaining in the competitive range," and, "if tradeoffs are deemed necessary, tradeoffs will be considered and applied." The Air Force will then select the "offeror who represents the best value," "unless preempted by application of the SLA priority. . . ."

Under the terms of the solicitation, the Air Force will "award a single contract resulting from this solicitation to the Technically Acceptable, responsible offeror whose proposal, conforming to the solicitation, offers the best value to the Government or to the SLA under the Randolph-Sheppard Act priority." The Air Force may determine that "award to the SLA shall preempt the best value offeror using the following criteria:"

If the SLA is within the competitive range, is found to be technically acceptable, has a performance confidence assessment rating of Satisfactory, and demonstrates through its proposal that it can provide such operation at a fair and reasonable price as determined by the Government after applying its source selection criteria contained in the solicitation; the priority/award will be given/made to the SLA subject to a determination of

contractor responsibility. **However, if the offer of the bidder considered to be the best value does not have a Performance Confidence Assessment rating of Satisfactory, then the priority of the Randolph-Sheppard Act will not be denied to the SLA because the SLA does not have a Performance Confidence Assessment rating of Satisfactory.** If the SLA proposal does not meet all criteria listed above, award to the SLA will not preempt the best value offeror and award will then be made to the best value offeror subject to a determination of contractor responsibility subject to consultations with the [United States] Department of Education.

(emphasis in original). Thus, pursuant to the terms of the solicitation, assuming the best value offeror is not the SLA, award of the contract to the SLA will preempt the award of the contract to the best value offeror if the SLA is within the competitive range, receives a Satisfactory Performance Confidence Assessment rating, is found to be technically acceptable, offers a price determined to be fair and reasonable, and is deemed a responsible contractor. If, however, the SLA does not satisfy these criteria, then the contract will be awarded to the best value offeror, subject to a determination of contractor responsibility and consultation with the United States Department of Education.

The State of Texas, by and through the Texas Department of Assistive and Rehabilitative Services (Texas DARS), Business Enterprises of Texas, submitted a timely proposal in response to the solicitation. According to protestors, after the proposal was submitted, the name of the Texas DARS was subsequently changed to the Texas Workforce Commission, Business Enterprise of Texas, which filed the above-captioned bid protest. The State of Texas, acting by and through the Texas Workforce Commission, Business Enterprises of Texas, is a Texas state agency and is the SLA under the Randolph-Sheppard Act for the purposes of this procurement. The State of Texas selected Mr. Roland Marshall as the licensed blind vendor under the Randolph-Sheppard Act for the contract at issue. Mr. Marshall is the intended beneficiary of the proposal submitted by the State of Texas in response to the solicitation and was responsible for the preparation and submission of the proposal. The proposal explained that the State of Texas "has assigned 100% of the management and operation of the contract contemplated by Solicitation No. FA3016-15-R-003 to Mr. Roland Marshall, a qualified, licensed Randolph-Sheppard (RS) Manager pursuant to the Randolph-Sheppard Act." The proposal stated further, "Mr. Marshall will provide the on-site contract management and production. His exercise of authority will be guided by the Business Enterprises of Texas (BET) Manual of Operations, the Manager's Agreement with the agency, and the Contract." Protestors assert that, "[o]ver the past sixteen years," they "have successfully been awarded and performed the preceding six FFS [Full Food Service] contracts at JBSA under the RSA [Randolph-Sheppard Act]."

After the Air Force reviewed the proposals, the protestors' proposal was excluded from the competitive range and eliminated from the competition because of what was considered to be an unreasonably high price proposal. The Air Force informed protestors that their proposal had been rated technically acceptable and had received a Performance Confidence Assessment rating of "Substantial Confidence." In response to being excluded from the competitive range, the State of Texas filed a request for

arbitration with the United States Department of Education, in accordance with the Randolph-Sheppard Act and 34 C.F.R. § 395.33 (2017). Protestors argued that the exclusion of the State of Texas proposal from the competitive range violated the Randolph-Sheppard Act, and an Arbitration Panel was convened by the United States Secretary of Education pursuant to the Act. See 20 U.S.C. § 107d-2 (2012). Prior to the issuance of the Arbitration Panel's decision, however, the Air Force awarded the contract for full food services to another offeror, FSIG.

As noted above, following the contract award to FSIG, the State of Texas and Mr. Marshall filed the earlier bid protest in the United States Court of Federal Claims challenging the contract award to FSIG and seeking injunctive relief to prevent the contract awardee from proceeding with contract performance. See State of Texas et al. v. United States, Case No. 17-266C. Following an initial bid protest hearing in the earlier bid protest, the Air Force agreed to voluntarily stay performance under the contract awarded to FSIG until resolution of the bid protest and issued a stop work order. During the earlier bid protest hearing, civilian Air Force counsel stood up and, among other statements, indicated that the Air Force may not comply with the decision of the United States Department of Education Arbitration Panel, once issued.

It was after the bid protest was filed and the bid protest hearing was held, that the United States Department of Education issued its arbitration decision. The decision explained that the Air Force had failed to properly apply the solicitation evaluation criteria and had improperly excluded the State of Texas from consideration, in violation of the Randolph-Sheppard Act. The arbitration decision explained that the head of the agency must take action to carry out the decision of the Arbitration Panel, and it directed the Air Force to "[i]nclude the SLA in the competitive range and commence negotiations with it."

After the United States Department of Education issued its arbitration decision, the Air Force filed a notice of corrective action, which stated: "[T]he Air Force intends to take corrective action by making a new competitive range determination and, should a new contractor be selected for award, the Air Force will terminate for convenience the contract awarded to [FSIG]." In response, protestors challenged the Air Force's corrective action and argued that the agency had failed to fully implement the recommendation of the United States Department of Education Arbitration Panel.

The undersigned held a second hearing to discuss the impact of the United States Department of Education's arbitration decision, the Air Force's proposed corrective action plan, and protestors' challenge to the proposed corrective action. During the hearing, the Air Force representatives indicated that a new evaluation and selection process would be undertaken, that the State of Texas would be included in the competitive range, and that proper deference would be given to the United States Department of Education arbitration decision. Based on the proposed course of corrective action, the undersigned granted protestors' request for permanent injunctive relief and enjoined the Air Force from proceeding with the contract award to FSIG. See State of Texas et al. v. United States, Case No. 17-266C (order issued March 7, 2017). As a result, State of Texas et al. v. United States, Case No. 17-266C, was dismissed, without prejudice, and the Air Force

proceeded with its corrective action. See State of Texas et al. v. United States, Case No. 17-266C (dismissed March 7, 2017).

After the bid protest was dismissed, the Air Force notified the State of Texas that, as represented to the undersigned, it was taking corrective action that would consist of making a new competitive range determination in accordance with the terms of the solicitation that will include the State of Texas, as well as evaluating the proposals in the competitive range and making a new award decision. The Air Force also explained that it would terminate the contract awarded to FSIG and make a new contract award following completion of the corrective action evaluations.

As part of the corrective action, the Air Force established a new competitive range that included six offerors, including the State of Texas. The Air Force notified the offerors in the competitive range that "[t]o ensure fairness for all offerors being included in the competitive range redetermination, a second technical evaluation was conducted." The Air Force informed the State of Texas that, as a result of this second technical evaluation, "the Government found a deficiency area and some weaknesses that will be provided on evaluation notices" to the State of Texas. Subsequently, the Air Force sent evaluation notices to the State of Texas and to two other offerors in the competitive range to address "significant weaknesses and deficiencies" in their proposals. The State of Texas responded to the evaluation notices. The Air Force evaluated the offerors' responses to the evaluation notices and narrowed the competitive range to four offerors, including the State of Texas. Thereafter, the Air Force sent another "Evaluation Notice" to the State of Texas "seeking other than cost or pricing data relative to the Agency's evaluation under the Price Factor." The State of Texas responded to this evaluation notice and reduced its proposal price. Based on representations to the court by the Air Force, as the instant bid protest is proceeding, the Air Force intends to send out requests for Final Proposal Revisions to the four offerors in the competitive range, including the State of Texas.

Upon learning that other offerors in the competitive range also would be submitting Final Proposal Revisions, the State of Texas and Mr. Marshall filed agency level protests with the Air Force asserting that the State of Texas was entitled to contract award immediately upon being included in the competitive range. Protestors argued that, because the State of Texas was included in the competitive range, the Air Force only should be conducting negotiations or discussions with the State of Texas and "only Texas should be awarded the contract at this point." According to protestors, "procurement statutes and regulations . . . require award to Texas if it is placed in the competitive range." The Contracting Officer denied the agency level protests filed by the protestors.

On June 22, 2017, while the Air Force's evaluation of proposals in the competitive range was ongoing, protestors filed the above-captioned bid protest in the United States Court of Federal Claims. Protestors challenge the Air Force's implementation of the corrective action taken in response to the previously filed bid protest, State of Texas et al. v. United States, Case No. 17-266C, and argue that the Air Force is violating the Randolph-Sheppard Act. Protestors allege that, once the State of Texas was included in the competitive range, it was entitled to automatically receive the contract award under the Randolph-Sheppard Act, and that the Air Force should not be allowed to conduct

negotiations with other offerors in the competitive range. Protestors argue that "[b]y allowing other offerors in the competitive range, conducting discussions with them and soliciting final proposal revisions from these offerors, the Air Force continues to act in an arbitrary and capricious manner." Protestors seek injunctive relief to enjoin the Air Force from "commencing or continuing negotiations with any offeror other than Texas in response to the Solicitation," "receiving final proposal revisions from any offeror other than Texas in response to the Solicitation," and "awarding any contract under the Solicitation to any offeror other than Texas."

At the time protestors filed their complaint in this court, the Air Force was in the process of evaluating proposals and conducting discussions with offerors in the competitive range, including the State of Texas. As a result, when this bid protest was filed, the Air Force had not yet received Final Proposal Revisions or made a contract award decision.

After protestors filed their bid protest in this court, at an initial bid protest hearing, the Air Force agreed to voluntarily stay the award of a contract pending the resolution of this bid protest. Defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) (2017) and RCFC 12(b)(6) on the basis that protestors' claims are not ripe, protestors lack standing, and protestors have failed to state a claim upon which relief may be granted, to which protestors replied.[4]

## DISCUSSION

The current bid protest revolves around protestors' allegation that the Air Force is violating the Randolph-Sheppard Act. The Randolph-Sheppard Act provides a priority for blind persons to operate vending facilities on federal property. See 20 U.S.C. § 107(b). The Act was introduced in an effort to provide "blind persons with remunerative employment, enlarg[e] the economic opportunities of the blind, and stimulat[e] the blind

---

[4] The parties also dispute whether Mr. Marshall, who is the blind vendor licensed by the State of Texas to manage and perform contracts for vending facilities on federal property, has standing to pursue this bid protest as an actual or prospective offeror. In similar bid protests involving SLAs and vending facility contract awards, other judges on this court have differed on this issue. In North Carolina Division of Services for the Blind v. United States, 53 Fed. Cl. 147, 162 (2002), aff'd sub nom. N. C. Div. of Servs. for the Blind v. United States, 60 F. App'x 826 (Fed. Cir. 2003), the court found that the blind vendor did not have standing to pursue a bid protest because he was not the actual or prospective offeror. Id.; see also Wash. State Dep't of Servs. for the Blind v. United States, 58 Fed. Cl. 781, 782 n.3 (2003) (explaining that the parties were ordered to brief the issue of proper party status, if any, with regard to the blind vendor protestor). Yet, in State of North Carolina Business Enterprises Program v. United States, 110 Fed. Cl. 354, 366 (2013), the court accepted protestors' and the government's agreement that a blind vendor and the SLA were "collectively" the actual or prospective bidder. Id. As discussed below, because this court finds that the instant bid protest is not ripe for judicial review, it is not necessary, at this time, to determine Mr. Marshall's individual standing.

to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). "The Randolph-Sheppard Act established a program to promote the interests of the blind by authorizing blind persons to operate vending facilities in federal buildings with the goal of expanding economic opportunities available to the blind community." Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. 445, 448 (2004) (citing 20 U.S.C. § 107(a)), aff'd, 424 F.3d 1222 (Fed. Cir. 2005). To accomplish its purpose, the Randolph-Sheppard Act program requires federal buildings to contain a satisfactory site for a blind person to set up and operate a vending facility, and blind vendors receive a priority in operating those facilities, so long as they satisfy criteria established by implementing regulations. Id. According to the Act, the United States Secretary of Education shall prescribe regulations to assure that contract award priority is given to licensed blind persons and that "wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States." 20 U.S.C. § 107(b)(2).

The Randolph-Sheppard Act also directs the United States Secretary of Education to designate "the State agency for the blind in each State, or, in any State in which there is no such agency, some other public agency to issue licenses to blind persons." 20 U.S.C. § 107a(a)(5) (2012). The United States Secretary of Education receives and approves the applications of the entities in each State to become the SLA responsible for selecting blind vendors to operate cafeterias and vending facilities on federal property in that State, and to ensure that the vendors comply with the requirements of the Act. See 34 C.F.R. § 395.5 (2017). Upon approval, the applicant becomes the designated SLA for the State. See id. SLAs license individual blind vendors within their respective States and manage the procurement process on behalf of the vendors. See Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 448. SLAs, then, function as intermediaries between blind vendors and the federal government entity seeking cafeteria services.

In awarding contracts for vending facilities, priority is given to "blind persons licensed by a State agency." 20 U.S.C. § 107(b). The implementing regulations, as promulgated by the United States Secretary of Education, state that "[i]n order to establish the ability of blind vendors to operate a cafeteria in such a manner," SLAs are "invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality." 34 C.F.R. § 395.33(b). The implementing regulations further state that "[p]riority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines . . . that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided by employees, whether by contract or otherwise." 34 C.F.R. § 395.33(a).[5] The word "priority," however, is not defined in the Randolph-Sheppard Act or in the implementing regulations.

---

[5] Originally, the Randolph-Sheppard Act granted blind vendors a "preference" to operate vending facilities, however, the Act was amended in 1974 to provide a "priority" to blind vendors in operating vending facilities. See Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 448.

To be awarded a contract, the first step is for a prospective SLA to successfully fall within a competitive range established by the contracting officer. See Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 447. The proposals within the competitive range, including from an SLA, are then evaluated by the agency and,

> [i]f the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary [of Education] as required under paragraph (a) of this section.

34 C.F.R. § 395.33(b). If the SLA is not satisfied with the action taken in regards to its proposal, "it may file a complaint with the Secretary [of Education] under the provisions of [34 C.F.R.] § 395.37." Id.; see also Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 424 F.3d at 1225.

In the bid protest currently before the court, defendant has moved to dismiss the bid protest on the basis that protestors' claims are not ripe for judicial review. Ripeness is a doctrine of justiciability that concerns the readiness of an issue for judicial review. See Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Fisher v. United States, 402 F.3d 1167, 1176 (Fed. Cir. 2005). The ripeness doctrine "circumscribes the court's review to cases that present realized rather than anticipated or hypothetical injuries." Madison Servs., Inc. v. United States, 90 Fed. Cl. 673, 678 (2009). The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. at 149; see also NSK Ltd. v. United States, 510 F.3d 1375, 1384 (Fed. Cir. 2007). In considering the justiciability of a bid protest, the United States Court of Appeals for the Federal Circuit has held, "[a] claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383 (Fed. Cir. 2012). In the bid protest context, anticipation of a future procurement violation is not sufficient to make a claim ripe. See Brocade Commc'n Sys., Inc. v. United States, 120 Fed. Cl. 73, 79 (2015); see also Tenica & Assocs., LLC v. United States, 123 Fed. Cl. 166, 172 (2015). To assert ripeness, "there are two basic factors: '(1) the fitness of the issues for judicial decision[;] and (2) the hardship to the parties of withholding court consideration.'" See Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1383-84 (quoting Abbott Labs. v. Gardner, 387 U.S. at 149); see also Caraco Pharm. Labs., Ltd. v. United States, 527 F.3d 1278, 1294-95 (Fed. Cir. 2008). "If a claim is not yet ripe for judicial review, it should generally be dismissed without prejudice." Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1350 (Fed. Cir. 2015); see also Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) (explaining that the Court of Federal Claims "does not have jurisdiction over claims that are not ripe"). It is protestor's burden to establish ripeness. See Harris Patriot Healthcare Sols., LLC v. United States, 95 Fed. Cl. 585, 596 n.17 (2010).

The first factor "becomes a question of whether the challenged conduct constitutes a final agency action." Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384; see also Jacobs Tech. Inc. v. United States, 131 Fed. Cl. 430, 446 (2017) ("First, with respect to fitness for judicial review, the court must determine 'whether the challenged conduct constitutes a final agency action.' Sys. Application & Techs., 691 F.3d at 1384."). "[A]n agency decision is not ripe for judicial review until the allegedly offending agency has adopted a final decision." See NSK Ltd. v. United States, 510 F.3d at 1384. To be considered final, an agency's decision must mark the consummation of the agency's decision-making process and cannot be tentative or interlocutory. See id.; see also Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384; Madison Servs., Inc. v. United States, 90 Fed. Cl. at 678. Also, the agency action must be one by which rights or obligations have been determined or from which legal consequences will flow. Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384.

Regarding the second factor, the hardship to the parties, the court considers whether withholding court consideration would have an "immediate and substantial impact" on the protestors. Caraco Pharm. Labs., Ltd. v. United States, 527 F.3d at 1295. "The role of the federal courts is to provide redress for injuries that are concrete in both a qualitative and temporal sense." See Shinnecock Indian Nation v. United States, 782 F.3d at 1351 (internal quotation omitted). "The mere possibility of harm is insufficient." Jacobs Tech. Inc. v. United States, 131 Fed. Cl. at 446. Similarly, "[a]bstract, avoidable or speculative harm is not enough to satisfy the hardship prong." Pernix Grp., Inc. v. United States, 121 Fed. Cl. 592, 599 (2015). "In the bid protest context, there is no measureable hardship, at the time of the protest, flowing from a future, hypothetical agency decision adverse to the protestor." Id. "Unlike the standard for obtaining injunctive relief, which requires a showing of irreparable harm, the standard for ripeness requires a lesser showing of hardship." Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1385.

In their complaint, protestors "object to the scope of the corrective action initiated by the government." According to protestors, under the Randolph-Sheppard Act, the State of Texas "is entitled to the priority contract right" once it was included in the competitive range. Protestors argue that the Air Force's corrective action decision to include other offerors in the competitive range, to conduct discussions with other offerors, and to solicit Final Proposal Revisions from offerors, other than the State of Texas, violates the Randolph-Sheppard Act and is arbitrary, capricious, and an abuse of discretion. Protestors allege that "by failing to conduct negotiations/discussions solely with Texas and failing to make award to Texas, the Air Force continues to ignore relevant procurement statutes and regulations." Protestors seek injunctive relief to "enjoin the government from implementing its revised corrective action and enjoin the government from conducting discussions with other offerors and soliciting/receiving final proposal revisions from those same offerors." Protestors ask this court to "issue an injunction enjoining the government from making award under this Solicitation to any other offeror other than Texas."

According to protestors, this bid protest "focuses on the Air Force's decision to continue implementation of a corrective action plan that violates the Randolph Sheppard Act (RSA) and its regulations," by not making an automatic contract award to the State of

Texas and Mr. Marshall at this time. Protestors argue that the bid protest is ripe for judicial review because they are challenging the "implementation of the Air Force's corrective action which seeks to negotiate with, and solicit final proposal revisions from, offerors not otherwise eligible for award." Protestors allege that, based on the Randolph-Sheppard Act priority, once the State of Texas was included in the competitive range it was "entitled to the contract award under the RSA regulations and relevant Air Force Instructions." Protestors argue that, "[d]espite this priority right, the Air Force continues to require Plaintiffs to compete a second time for a contract it has already won." Protestors contend that the State of Texas "should in fact at this moment be 'the original contract awardee,'" and that having to compete "a second time" has an immediate and substantial impact on protestors, sufficient to meet the hardship analysis for ripeness.

Defendant, however, contends that "[t]his case is not fit for judicial decision because the Air Force has not consummated its decision-making process," including re-evaluation, and "no rights or obligations have been determined" because the Air Force's evaluation of proposals in the competitive range is still ongoing. Defendant asserts that "[n]either the Randolph-Sheppard Act nor any other authority provides support to plaintiffs' contention that the Air Force must negotiate only with Texas and make award to Texas" under the solicitation. Defendant argues that because there has been no final agency action regarding the application of the Randolph-Sheppard Act, and given that the Agency's current actions and the evaluation criteria in the solicitation are fully consistent with the Randolph-Sheppard Act, including application of a priority award to the SLA under the proper circumstances, protestors' claim is not ripe. According to defendant, only after the evaluation process does not result in a decision to award the contract to the State of Texas, and the United States Secretary of Education has been consulted, can the State of Texas allege that the Air Force did not follow the priority requirement in the Randolph-Sheppard Act. Additionally, defendant asserts that, to the extent protestors seek to challenge the evaluation criteria in the solicitation on the basis that the criteria do not adhere to the Randolph-Sheppard Act, protestors waived those protest grounds when they failed to challenge the terms of the solicitation prior to submitting a proposal.

Defendant also asserts that the State of Texas will suffer no hardship by waiting for the Air Force's award decision. Defendant argues that business uncertainty or the costs of competing with other offerors is not the basis for finding a protest ripe. Defendant contends that the Air Force may still award the contract to the State of Texas, which now is in the competitive range, and the State of Texas has the opportunity to engage in discussions with the Air Force. According to defendant, protestors cannot establish hardship by asserting that a future, uncertain decision by the Air Force, which could be made in protestors' favor, will harm the State of Texas or Mr. Marshall.

The issue protestors raise when alleging that the Air Force's corrective action violates the Randolph-Sheppard Act and its implementing regulations is that the State of Texas is entitled to an automatic "priority contract right" under the Randolph-Sheppard Act immediately following the Air Force's decision to include the State of Texas in the competitive range. As an initial matter, the court notes that the corrective action decision was favorable to protestors because the State of Texas was not the original contract

awardee and had been excluded from the competitive range. The corrective action creates the possibility that the State of Texas could actually receive the contract award following the re-evaluation and discussion process announced in the solicitation.

All parties in this bid protest agree that, under the Randolph-Sheppard Act, SLAs are to receive a priority in the procurement process to operate vending facilities on government property if their bids satisfy the conditions established by the regulations promulgated by the United States Department of Education. See Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 447. The implementing regulations of the Randolph-Sheppard Act establish the procedure for affording blind vendors a priority in contract awards. See 34 C.F.R. § 395.33(a). Significant to this bid protest, the regulations explain when a blind vendor will receive priority:

> Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, on an individual basis, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees. . . .

Id.; see also Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 455. The language of this regulation establishes that an SLA receives a priority after evaluation of the proposals in the competitive range and after consultation with the United States Secretary of Education. The SLA has to be able to operate the vending facility at a "reasonable cost" and with "food of a high quality comparable to the food currently provided employees."

In order for the consultation with, and review by, the United States Secretary of Education to occur, an SLA's proposal must have been evaluated by the relevant procuring agency pursuant to the evaluation criteria set forth in the solicitation. See 34 C.F.R. § 395.33(b). When an agency is contemplating the award of a cafeteria contract, the agency shall invite the appropriate SLA to respond to a solicitation for offers. See id. In the solicitation, the agency shall establish criteria under which all proposals will be judged. See id. If, after receipt of proposals, the agency judges the SLA's proposal to be within the competitive range and that it "has been ranked among those proposals which have a reasonable chance of being selected for final award," the agency then shall consult with the United States Secretary of Education. As the implementing regulation provides, before affording priority to an SLA under the Randolph-Sheppard Act, the United States Secretary of Education "must evaluate the quality and costs of the blind vendor's services to ensure that they are comparable to those of an incumbent vendor or other offerors." Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 455; see also 34 C.F.R. § 395.33(b). Thus, pursuant to the implementing regulations, an SLA must clear two hurdles before receiving a priority contract award under the Randolph-Sheppard Act. See id. "First, the managing agency must find that the SLA falls within 'a competitive range' and possesses 'a reasonable chance' of receiving the contract," and "[s]econd, after the managing agency makes the aforementioned determinations, the agency must consult with the Secretary of Education to determine

whether the SLA's operations 'can be provided at a reasonable cost, with food of a high quality.'" Id. (quoting 34 C.F.R. § 395.33(a)). The issue for the court is one of timing, specifically, at what point is the priority contemplated in the Randolph-Sheppard Act to be afforded to an SLA.

To support their position that the State of Texas is entitled to the priority under the Randolph-Sheppard Act at this time, protestors cite to five decisions of the United States Government Accountability Office (GAO) which they allege address the timing and rights of an SLA in the competitive range to receive a priority contract award under 34 C.F.R. § 395.33(b). See Md. State Dep't of Educ., B-400583 et al., 2008 WL 4911241, at *1 (Comp. Gen. Nov. 7, 2008); Cantu Servs., Inc., B-289666 et al., 2002 WL 3152230, at *1 (Comp. Gen. Nov. 1, 2002); Md. State Dep't of Educ., B-288501 et al., 2001 WL 914011, at *1 (Comp. Gen. Aug. 14, 2001); Centro Mgmt., Inc., B-286935 et al., 2001 WL 185215, at *3 (Comp. Gen. Feb. 26, 2001); Miss. State Dep't of Rehabilitation Servs., B-250783 et al., 1994 WL 503283, at *1 (Comp. Gen. Sept. 7, 1994). Protestors state, "[t]he GAO has consistently held that once a competitive range includes an SLA's proposal, the RSA regulations mandate award to the SLA."

Although the GAO decisions cited by protestors mention that if a designated SLA's proposal is found to be in the competitive range, then award automatically must be made to the SLA, these decisions are not persuasive and are distinguishable from the bid protest currently before the court.[6] In the most recent of the GAO decisions, Maryland State Department of Education, B-400583 et al., the GAO did not state that an SLA automatically receives an award if determined to be within the competitive range, but only stated that "if a designated SLA submits an offer found to be within the competitive range for the acquisition, award must generally be made to the SLA." Md. State Dep't of Educ., B-400583 et al., 2008 WL 4911241, at *1 (emphasis added). In Cantu Services, Inc., B-289666 et al., the GAO explained that, pursuant to 32 C.F.R. § 260.3 (g)(1)(3), "if a designated SLA submits an offer found to be within the competitive range, award must be made to the SLA absent a high-level determination by the agency and agreement by the Secretary of Education." Cantu Servs., Inc., B-289666 et al., 2002 WL 3152230, at *1. Notwithstanding protestors' reliance on this GAO decision, the regulation cited in Cantu Services, 32 C.F.R. § 260.3(g)(1)(3), was superseded on December 28, 2009, when the Department of Defense issued new regulations related to the vending facility program for the blind under the Randolph-Sheppard Act. See Vending Facility Program for the Blind on DoD-Controlled Federal Property, 74 Fed. Reg. 62,234-01 (Nov. 27, 2009) (to be codified at 32 C.F.R. pt. 260). The old regulation 32 C.F.R. § 260.3(g)(1) also was cited by the GAO in Centro Management, Inc., B-286935 et al. Additionally, unlike the solicitation in this bid protest, the solicitations in Cantu Services, Inc. and Centro Management, Inc. specified that award would be made to an SLA if its proposal was

---

[6] The court notes that GAO decisions are not binding on the United States Court of Federal Claims, however, this court has great respect for the scholarship and expertise of the GAO, and considers GAO decisions when reaching its own decisions. See Cleveland Assets, LLC v. United States, 132 Fed. Cl. 264, 280 n.15 (2017); see Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009).

included in the competitive range. See Cantu Servs., Inc., B-289666 et al., 2002 WL 3152230, at *1; Centro Mgmt., Inc., B-286935 et al., 2001 WL 185215, at *3. Because the regulation cited by the GAO in Cantu Services, Inc. and Centro Management, Inc., is no longer in place, and the solicitation in this bid protest does not contemplate an automatic award to the SLA once it is included in the competitive range, these GAO decisions are not helpful to protestors.

Protestors also rely on the GAO's decision in Mississippi State Department of Rehabilitation Services, B-250783 et al., in which the GAO stated, "if a designated state licensing agency (SLA) submits an offer found to be within the competitive range for the acquisition, award must be made to the SLA" pursuant to 34 C.F.R. § 395. Miss. State Dep't of Rehabilitation Servs., B-250783 et al., 1994 WL 503283, at *1. There is no additional explanation or support for this statement in the GAO decision, and the statement is not dispositive to the GAO's dismissal in Mississippi State Department of Rehabilitation Services. See id. In Mississippi State Department of Rehabilitation Services, the GAO concluded that it did not have jurisdiction to consider protests alleging that an agency failed to comply with the Randolph-Sheppard Act, because that authority was vested in the United States Secretary of Education. See id. at *2. Similarly, notwithstanding protestors' reliance on the GAO's decision in Maryland State Department of Education, B-288501 et al., in which the GAO stated "if a designated SLA submits an offer found to be within the competitive range for the acquisition, award must be made to the SLA," the GAO ultimately dismissed the protest in Maryland State Department of Education for lack of jurisdiction. Md. State Dep't of Educ., B-288501 et al., 2001 WL 914011, at *1. The GAO explained, "Congress has specifically authorized the Secretary of Education, not our Office, to review complaints from SLAs about agency compliance with the Randolph-Sheppard Act, and since these protests raise issues clearly related to the reach and scope of the Act, we will not review the Maryland State Department of Education's protests." See id. at *4. In both Mississippi State Department of Rehabilitation Services and Maryland State Department of Education, whether or not an SLA that was included in the competitive range was entitled to receive an automatic contract award was not dispositive to the GAO's ultimate absence of jurisdiction conclusion. See Md. State Dep't of Educ., B-288501 et al., 2001 WL 914011, at *1; Miss. State Dep't of Rehabilitation Servs., B-250783 et al., 1994 WL 503283, at *1. Accordingly, because the statements in these GAO decisions on which protestors rely were not critical to the outcome of the decisions, and include little or no analysis of the reasons for what essentially were dicta type statements, these decisions do not persuade this court to find that an SLA is entitled to receive an automatic priority contract award immediately upon being included in the competitive range, without further evaluation by the agency of the SLA proposal submitted to the agency and the consultation with the United States Department of Education required by the Randolph-Sheppard Act implementing regulations. In Commonwealth of Kentucky, Education Cabinet, Department for the Blind v. United States, a judge on this court explained, in contrast to the GAO decisions, "the regulations do not provide an automatic priority for an SLA whose proposal falls within a competitive range; even if the SLA's proposal does fall within the competitive range, the Secretary could still deny the

SLA the priority."[7] <u>Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States</u>, 62 Fed. Cl. at 455.

In their complaint, protestors also allege that, once inside the competitive range, not only agency regulations, but also United States Department of Defense instructions, require the Air Force to award the contract to the State of Texas. Protestors cite to United States Department of Defense Directive (DODD) 1125.3 (1978), Air Force Instruction (AFI) 34-206 (2012), and Army Regulation 210-25 (2004). As defendant asserts, DODD 1125.3 was replaced by DoD Instruction 1125.03 in 2009. Although protestors argue the State of Texas is entitled to the contract award pursuant to DOD Instruction 1125.03, that instruction does not require an automatic contract award to the SLA once it is included in the competitive range. Instead, DOD Instruction 1125.03 states: "The blind have a priority to operate vending facilities on DoD property, whenever feasible, in light of appropriate space and potential patronage." This language is consistent with the Randolph-Sheppard Act and the implementing regulations, which afford a priority to an SLA after evaluations are conducted and there has been consultation with the United States Secretary of Education, who has also determined that the SLA can provide the services "at a reasonable cost, with food of a high quality comparable to that currently provided by employees, whether by contract or otherwise." 34 C.F.R. § 395.33(a).

Similarly, with regard to AFI 34-206, protestors argue that AFI 35-206 "affirmatively states" that "'[i]f the SLA submits a proposal that is within the competitive range established by the contracting officer, the contract ***will be*** awarded to the SLA. . . .'" (emphasis in original). While AFI 34-206 does, in fact, state that "[i]f the SLA submits a proposal that is within the competitive range established by the contracting officer, the contract will be awarded to the SLA," AFI 34-206 also explicitly describes two exceptions to this general statement. First, AFI 34-206 explains that the "contracting officer may award to other than the SLA" when a determination is made that "the award to the SLA would adversely affect the interests of the United States, and the Secretary, U.S. Department of Education, approves the determination." Second, AFI 34-206 states that the "contracting officer may award to other than the SLA" when a determination is made, "and the Secretary, U.S. Department of Education, agrees, that the blind vendor does not have the capacity to operate a cafeteria/dining facility in such a manner as to provide food service at a comparable cost and of comparable high quality as that available from other providers of cafeteria services." As this language demonstrates, AFI 34-206 sets forth the same process for determining whether an SLA shall receive a priority as 34 C.F.R. § 395.33(a).

---

[7] Protestors also cite <u>Automated Communication Systems, Inc. v. United States</u>, 49 Fed. Cl. 570, 578 n.8 (2001), to support their position "guaranteeing" a contract award to an SLA "once the vendor makes the competitive range for a vending services contract." The court's statement on which protestors rely, however, is contained in a footnote and does not acknowledge or address the process for determining whether to afford a priority to the SLA, as prescribed in the Randolph-Sheppard Act implementing regulations, nor offer any analysis or support for the footnote. <u>Id.</u>

As discussed in this opinion, the Air Force's evaluation of the proposals is ongoing and the United States Secretary of Education has not yet determined whether the State of Texas can provide the full food services at a comparable, reasonable cost and with food of a high quality. Because the Air Force and the United States Secretary of Education have not yet determined whether the State of Texas will receive a priority award, protestors have failed to establish that the Air Force's actions have violated DOD Instruction 1125.03 or AFI 34-206.

As 34 C.F.R. § 395.33 makes clear, and as this court has previously indicated, neither the Randolph-Sheppard Act, nor the implementing regulations provide an automatic priority award for an SLA proposal that falls within a competitive range, because, even if the SLA's proposal does fall within the competitive range, based on the agency's evaluation, the United States Secretary of Education could still not afford an SLA the priority based on the United States Department of Education's agreement with the agency that the SLA could not provide the service with "reasonable cost, [and] with food of a high quality comparable to that currently provided employees, whether by contract or otherwise." 34 C.F.R. § 395.33(a); see also Commonwealth of Ky., Educ. Cabinet, Dep't for the Blind v. United States, 62 Fed. Cl. at 455. Although protestors in this bid protest argue that inclusion in the competitive range should automatically lead to the SLA receiving the priority award under the Randolph-Sheppard Act, the regulations implementing the Act set forth a multi-step process, including a cost evaluation and a food quality evaluation, that an agency must complete before the case is referred to the United States Secretary of Education.

In the instant bid protest, the Air Force has not completed the evaluation process for determining cost and food quality for the SLA or other offerors. See 34 C.F.R. § 395.33. Therefore, whether or not a priority contract award should be afforded to the State of Texas, has yet to be determined and the bid protest is not yet ripe. While it is undisputed that the State of Texas is within the competitive range, the Air Force is continuing to conduct discussions with the State of Texas, as well as with other offerors, and indicated its intent to seek final revised proposals from all offerors in the competitive range. As required by 34 C.F.R. § 395.33(b), the Air Force announced criteria in the solicitation, consistent with the Randolph-Sheppard Act, by which it intends to judge proposals, and the Air Force appears to be following those solicitation criteria. There is no indication in the record before the court, thus far, that the State of Texas has been ranked by the Air Force as "among those proposals which have a reasonable chance of being selected for final award" based on price and technical acceptability so as to trigger the Air Force's obligation before award to consult with the United States Secretary of Education. See 34 C.F.R. § 395.33(b). That the State of Texas is included in the competitive range is not equivalent to a finding by the agency that the SLA's proposal is among the proposals that have a reasonable chance of award. The State of Texas was included in the competitive range as a result of the United States Department of Education Arbitration Panel's earlier decision, directing the Air Force to include the State of Texas in the competitive range as the procurement moved forward. The Air Force complied with the instruction of the Arbitration Panel notwithstanding the weaknesses previously identified in the State of Texas's proposal. The Air Force has not yet completed its evaluation process, as set forth in the solicitation, or consulted with the United States

Secretary of Education regarding contractor selection, nor has the United States Secretary of Education had the opportunity to make her determination, as required by 34 C.F.R. § 395.33(a).

Protestors argue, however, that the multi-step process delineated in the Randolph-Sheppard Act implementing regulations has effectively been completed. Protestors infer a great deal from the United States Department of Education's Arbitration Panel decision which ordered the agency to include the State of Texas in the competitive range. The conclusion of the Arbitration Panel was that "the Contracting Officer must take action to carry out the decision of the panel. He shall include the SLA in the competitive range and commence negotiations with it." Protestors argue that the United States Department of Education arbitration decision satisfies the requirement set forth in 34 C.F.R. § 395.33(a) to consult with the United States Department of Education. Protestors allege that the United States Department of Education "was convinced that Texas is able to provide 'at a reasonable cost, [] food of a high quality comparable to that currently provided employees, whether by contract or otherwise,'" and that the United States Department of Education has "effectively confirmed that this placement does not 'adversely affect the interests of the United States.'" Protestors also argue that "[b]y placing Texas in the competitive range, the DOE [Department of Education] has also affirmed that Texas has 'the capacity to operate a cafeteria/dining facility in such a manner as to provide food service at a comparable cost and of comparable high quality as that available from other providers of cafeteria services.'"

Notwithstanding protestors' allegations, the requirements and process prescribed in the Randolph-Sheppard Act and implementing regulations should not be circumvented by operation of the Arbitration Panel's decision on a different issue of whether or not the proposal submitted by the State of Texas should be included in the competitive range. The consultation requirement with the United States Department of Education after evaluation and agency selection is a different one from what has already occurred at the Arbitration Panel. The implementing regulations allow the United States Secretary of Education to have a specific role in whether a priority should be afforded to an SLA. The Randolph-Sheppard Act and the implementing regulations do not provide that an Arbitration Panel decision reviewing an SLA's appeal regarding whether or not an SLA should be excluded from the competitive range can serve as a substitute for the required consultation with the United States Secretary of Education near the end of the selection process, after evaluation, discussions with those offerors in the competitive range, and a determination of comparable price and comparable quality of the food service. The earlier arbitration decision issued by the United States Department of Education, although it included a discussion of the Randolph-Sheppard Act, did not make the finding that the protestors infer, but only directed the Air Force to include the State of Texas in the competitive range. The Air Force complied with that decision when it took corrective action to end the earlier bid protest in this court. The State of Texas may still prevail in receiving the priority contract award. Given the ongoing Air Force's evaluation of proposals, and that the United States Secretary of Education has not been consulted as to whether the State of Texas should be afforded a priority under the Randolph-Sheppard Act, the State of Texas is not entitled to the "priority contract right" at this time. In <u>Systems Application & Technologies, Inc. v. United States</u>, a case cited by protestors, the United

States Court of Appeals for the Federal Circuit explained that the agency's decision to engage in corrective action "is sufficiently final" because that decision "set in motion several irretrievable legal consequences." Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1384-85. Although framed as a protest of the corrective action taken in response to the earlier filed bid protest, State of Texas et al. v. United States, Case No. 17-266C, the Air Force's corrective action was to allow the SLA to be included in the competitive range as directed by the Arbitration Panel. The SLA and Mr. Marshall asked for that result from the Arbitration Panel, and, ultimately, the Air Force took the corrective action sought by including the State of Texas in the competitive range. Because the Air Force has not yet made a contractor selection decision, and may not take any action to which protestors even want to assert violations of the Randolph-Sheppard Act, the protest is not ripe and the Air Force's decision to engage in discussions with other offerors in the competitive range does not result in irretrievable consequences to the protestors or a violation of the Randolph-Sheppard Act.

The court further notes that protestors' argument that the State of Texas was entitled to an immediate priority contract right as soon as it was included in the competitive range is also not consistent with the Randolph-Sheppard Act, the implementing regulations at 34 C.F.R. § 395.33, and the established principle in this court that an agency cannot deviate from the terms of its solicitation when conducting its evaluation of proposals. Relevant to this bid protest, the solicitation set forth evaluation criteria for determining whether and when to afford the priority to the SLA, which are consistent with the Randolph-Sheppard Act and the implementing regulations. Agencies are required to evaluate proposals and make contract awards based on the criteria set forth in the solicitation. See NEQ, LLC v. United States, 88 Fed. Cl. 38, 47–48 (2009) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). It is equally well-established that agencies cannot evaluate proposals based on criteria that are not disclosed in the solicitation. See NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015). This court in Banknote Corp. of America, Inc. v. United States stated:

> It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) . . . which indicate[s] that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. See 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000) . . . . It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999), and, where appropriate, must disclose the factors' relative importance, Isratex, Inc. v. United States, 25 Cl. Ct. 223, 230 (1992). See also Cube Corp. v. United States, 46 Fed. Cl. 368, 377 (2000); Dubinsky v. United States, 43 Fed. Cl. 243, 266 (1999). That said, an agency still has "great discretion in determining the scope of an evaluation factor." Forestry Surveys & Data v. United States, 44 Fed. Cl. 493, 499 (1999). Consistent with these precepts, in a case such as this, a protester must show that: (i) the procuring agency used a significantly different basis

in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.

\*\*\*

[I]t is well-settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 45 (1997)[.]

Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386-87 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) (footnote and other citations omitted); see also NVE, Inc. v. United States, 121 Fed. Cl. at 180; Transatlantic Lines, LLC. v. United States, 122 Fed. Cl. 624, 632 (2015); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 388 (2011) ("It is a fundamental principle of procurement law that an agency must conduct its best-value analysis using the evaluation factors and subfactors specified in the solicitation." (citing 48 C.F.R. § 15.101–1(b)(1) (2011); 48 C.F.R. § 15.305(a) (2011); Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999))); PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 536-37; NEQ, LLC v. United States, 88 Fed. Cl. at 47-48; PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 13-14 (2006).

As explained above, in this bid protest, the solicitation terms provided that, assuming the best value offeror is not the SLA, award of the contract to the SLA will preempt the award of the contract to the best value offeror if the SLA is within the competitive range, receives a Satisfactory Performance Confidence Assessment rating, is found to be technically acceptable, offers a price determined to be fair and reasonable, and is deemed a responsible contractor. If the SLA's proposal satisfies the requirements to preempt the contract award to the best value offeror, then the Air Force would be required to consult with the United States Secretary of Education. If, however, the SLA does not satisfy this criteria, then the contract will be awarded to the best value offeror, subject to a determination of contractor responsibility and consultation with the United States Department of Education. Although the State of Texas now has been included in the competitive range, at the time this bid protest was filed, the Air Force had not determined whether or not the State of Texas was the best value offeror, thus it had not yet been able to apply the formula for prioritization as provided in the solicitation, consistent with the Randolph-Sheppard Act and the implementing regulations. Now, because the Air Force has not yet decided whether the State of Texas should or should not receive the contract award, the Air Force has not yet consulted with the United States Secretary of Education, as required by 34 C.F.R. § 395.33. If the Air Force consulted with the United States Secretary of Education before completing the evaluation process described in the solicitation, such an action could be vulnerable to a finding of being arbitrary, capricious, and in violation of the law because it would be a deviation from the solicitation terms and 34 C.F.R. § 395.33, and the United States Secretary of Education likely would not have sufficient evaluation information on which to base her decision when consulted.

Regarding the second part of the ripeness analysis, hardship to the protestors, protestors argue that the State of Texas not only should have been the automatic "original" contract awardee, but that having to compete "a second time" for the contract has an immediate and substantial impact on protestors, sufficient to meet the hardship analysis for ripeness. Protestors' argument that it is, by right, already the "original" contract awardee is without any basis. The Air Force awarded the original contract to FSIG. Protestors appear to argue that, because the State of Texas was allegedly entitled to receive the contract award once it was included in the competitive range, the State of Texas effectively won the contract. As discussed above, protestors' argument is unpersuasive because the State of Texas was not entitled automatically to receive the contract award when it was included in the competitive range. While protestors assert that continuing the ongoing evaluation and discussions have deprived the State of Texas of its priority right, the ongoing evaluation and selection process will determine whether the State of Texas should have a priority right to the contract. As noted above, the State of Texas continues to have a chance to receive the contract.[8] Protestors' allegations arising from the Randolph-Sheppard Act are not ripe for judicial decision because there has not been a determination as to whether the State of Texas is entitled to a priority contemplated in accordance with the Randolph-Sheppard Act and the implementing regulations. Given the absence of a final agency action and that protestors remain in the competition, mitigating any hardship, protestors' challenge in this bid protest is not yet ripe for judicial review.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is **GRANTED**. Accordingly, protestors' complaint is **DISMISSED**, without prejudice. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[8] 34 C.F.R. § 395.33(d) sets forth the process by which an agency may afford priority to blind vendors through direct negotiations with SLAs. This regulation contemplates two scenarios for the priority: one resulting from competition, as in this bid protest, or one resulting from direct negotiations. The agency chose, as it was entitled to do, to go through the competitive process, which was acknowledged by the earlier United States Department of Education Arbitration Panel.